FARMERS' BANK OF DELAWARE *vs.* BEASTON, GARNISHEE OF THE ELKTON BANK OF MARYLAND.—*E. S. June,* 1836.

Money or effects in the hands of an assignee of a bankrupt, or the trustee of an insolvent debtor cannot be attached; not only because such property stands assigned by operation of law, but because the allowance of such attachments would utterly defeat the whole policy of the bankrupt or insolvent laws.

Money taken by a sheriff in execution, or money paid into court, cannot be attached.

The appointment and bonding of a receiver does not prevent the goods, &c. which he would be authorized to take into possession from being attached, for until taken by the receiver they are not subject to the summary jurisdiction of the court of chancery, nor within its protection.

The *Elkton Bank* was indebted to the *Farmers' Bank of Delaware*, on judgment rendered at April Term, 1830, and to *the United States*, on judgment rendered at December Term, 1829. B was indebted to the *Elkton Bank*, on judgment rendered in 1828. The *Farmers' Bank* attached B's debt in September 1830; and *the United States* after this attachment was issued and served, attached the same debt, and obtained judgment of condemnation at April Term, 1832, which B satisfied. The attachment of the *Farmers' Bank,* still pending, it was held, that neither the proceedings on the part of *the United States,*—the inability of the *Elkton Bank* to pay her debts, nor the appointment and bonding of receivers under the authority of the *Circuit Court of the United States,* prior to the suing out of the first attachment, (but which receivers never acted) constitutes any defence to such prior attachment, which operated as a lien on the debt attached.

It was the duty of B to have given the *Farmers' Bank* notice of the attachment by *the United States,* that she might have vindicated her rights, or brought the conflicting creditors into chancery, where these priorities might have been settled without prejudice to him; and not having even pleaded pendency of the prior attachment in bar to the second, he had no right to complain of the hardship of a second compulsory payment.

The decisions of the Supreme court of the United States in relation to the

nature of the insolvency which secures to the United States a priority in the payment of debts, under the acts of congress, examined.

Even when the legislature of the State has the power to wind up the concerns of a corporation, the provisions of the law, calculated to apprise all interested, of the fundamental changes about to be produced in its government, should appear to have been complied with, to give legal efficacy to the acts done under it; otherwise the property of the corporation will not be divested, and its charter will continue in existence.

APPEAL from *Cecil* county court.

On the 24th of September, 1830, the appellant issued an attachment on judgment, against the *Elkton Bank of Maryland*, rendered by the *Cecil* county court, at its April term, 1830. The writ was returnable to the following *October* term of the court, when the sheriff returned, that he had, in virtue thereof, attached $500 in the hands of the appellee *Beaston*, and summoned him as garnishee. He appeared by counsel, and at April term, 1834, the case was submitted to the county court upon the following statement of facts.

" It is agreed in this case, that in 1828, *The United States* instituted suit against the *Elkton Bank* in the *Circuit Court of the United States* and at *December* term, 1829, a verdict and judgment therein, was rendered in favour of *the United States* for $21,200; on which judgment a *fi. fa.* issued to April term, 1830, and was returned *nulla bona.* But it is admitted that, at that time, the *Elkton Bank* had a large landed estate which has been since sold, and applied to satisfy in part the said judgment; which landed estate, with all the other effects, or property belonging to the *Bank*, would not enable the *Bank* to pay its debts, and that the same property and effects, are insufficient to pay the said debt due to *the United States*, and it is admitted that the *Bank* was then unable to pay its debts. An appeal was prosecuted, but no appeal bond given, and the judgment was affirmed in the *Supreme Court* at *January* term, 1832. At the *April* term, 1830, of the *Circuit Court*, a bill in equity was filed against the said *Bank*, at the suit of the *United States*, and *Nathaniel Williams* and *John Glenn* were appointed, by an order of the court, Receivers, with authority to take possession of the pro-

perty of the said *Bank*, to dispose of the same, and to collect all the debts due it. That the Receivers gave bond on the 14th of June, 1830, and proceeded to execute their trust. At December session, 1829, application was made to the Legislature of *Maryland*, by the several persons who were the acting President and Directors of the *Bank*, for the act which passed at that session, chapter 170, (which with the other acts relating to the *Bank* make portions of this statement.) That a meeting of the stockholders convened on the 17th of May, 1830, which was the third Monday of said month, but without the publication of the notice, mentioned, and required in the act incorporating the *Bank*, and its supplements ; and at the same meeting a majority of the stockholders appointed two trustees, in conformity with the provisions of said act, who declined accepting, and no trustees have been since appointed, nor has there since been an annual or other meeting of the stockholders, or an election of the Directors ; nor have there been any banking operations carried on by any person professing to be the corporation of the *Elkton Bank* since March, 1829. At *September* term, 1828, the *Elkton Bank* obtained a judgment against *George Beaston* for the sum which is attached in this suit, which, at the time of the issuing and service of this attachment had not been paid by *Beaston.* At April term, 1830, the *Farmers' Bank of Delaware*, obtained in *Cecil county court* a judgment against the *Elkton Bank* for $5,000 with interest from December, 1825, and before the appointment and bonding of the Receivers as aforesaid, that is, on the 24th September, 1830, issued this attachment, and attached in the hands of *Beaston* the sum of $500; and after the attachment was issued and served, and after the affirmance of the judgment of the *Circuit court* by the *Supreme court*, the attachment was issued by *the United States*, upon which there was a judgment of condemnation at April term, 1832. This latter judgment was entered satisfied, by order of the District Attorney of *the United States* on the 15th of December, 1832, the amount for which it was rendered having been paid by *Beas-*

*ton.* It was also admitted that up to the time of the decision in the *Supreme court*, the Receivers never had collected or received, or by any process of law, attempted to collect or recover the said debt attached in this case."

Upon this statement, the County court gave judgment for the defendant, and the plaintiff appealed to the Court of Appeals.

The cause was argued before BUCHANAN, Ch. J., and STEPHEN, ARCHER, DORSEY, and SPENCE, Judges.

GROOME for the appellant, cited

The acts of Congress of 1789, ch. ɔ, sec. 21; 1790, ch. 35, sec. 45; 1792, ch. 27, sec. 18; 1797, ch. 74, sec. 5. *United States vs. Hooe, et al.* 3 *Cranch.* 73. *Thelusson et al. vs. Smith,* 2 *Wheat. Rep.* 396. 1 *Peters.* 386, 439. *Angel vs. Smith,* 9 *Ves.* 336. 2 *Kent.* 249, *&c. The State vs. The Bank of Maryland,* 6 *Gill and Johns.* 205. *Prince vs. Bartlett,* 8 *Cranch.* 431. *Ex part Key vs. Kernot,* 2 *Mad.* 232, 3. *Skip vs. Harwood,* 3 *Atk.* 564. *Case No.* 14, 2 *Atk.* 15. *Sharp vs. Carter,* 3 *Pr. Wms.* 379.

MARTIN for the Appellee, referred to

The Maryland law of 1829, ch. 170 : act of Congress of 1818, ch. 78, sec. 8. 3 *Story's L. U. S.* 1670, 5 *Peters.* 641. *United States vs. Howland & Allen,* 4 *Wheat.* 108, 115. *Robinson vs. Campbell,* 3 *Wheat.* 212, 221, 2 *Mad.* 233, 243. *State of Georgia vs. Brailsford et al.* 3 *Dallas.* 3. *United States vs. Vaughan,* 3 *Binney.* 394. *Fisher vs. Blight,* 2 *Cranch.* 358. *Harris vs. Dennie,* 3 *Peters.* 301, *Serg. on Atta.* 147. *Dimond vs. Billingslea,* 2 *Harr. and Gill,* 264.

ARCHER, Judge, delivered the opinion of the court.

Exemption is claimed by the defendant from the operation of the attachment in this case.

Having had judgment of condemnation passed against him, for the amount he stood indebted to the *Elkton Bank of*

*Maryland,* at the suit of *the United States,* and having paid the money under such judgment ; he rests his defence upon an alleged priority, given by the acts of Congress to the government, and upon certain proceedings of the government, had in the Circuit court of the *United States* for the district of *Maryland,* for the recovery of her claim against the *Elkton Bank of Maryland.*

The priority of the United States, is supposed to be founded, on the just construction of the act of Congress, making provision for the collection of her debts.

We have been referred in the argument to the laws of 1789, ch. 5, sec. 21—1790, ch. 53, sec. 45—1792, ch. 27, sec. 18—1797, ch. 74, sec. 5, and the collection law to be found in the third volume of the Laws of the *United States,* ch. 128, sec. 65.   Interpretations by various decisions of the *Supreme court of the United States,* and of the *Circuit courts,* have been given to these acts of Congress, which leave no doubt as to their construction.    It will therefore be only necessary to refer to them.

The two first acts above cited, had reference to bonds given for duties ; and the third act above referred to, made provision in relation to the securities in such bonds.    These acts gave a preference to *the United States,* in all cases of insolvency, or where any estate in the hands of executors, or administrators shall be insufficient to pay all the debts of the deceased ; and it was declared, that the case of insolvency referred to, should be deemed to extend to all cases, in which a debtor, not having sufficient property to pay all his debts, should have made a voluntary assignment thereof, for the benefit of his creditors, or in which the estate, and effects, of an absconding, concealed, or absent debtor, shall have been attached by process of law ; or to cases in which an act of legal bankruptcy, shall have been committed. And by the two subsequent laws the same provision was made, securing the priority of *the United States,* and applying them to all other debts due *the United States.*    In the year 1805, *the Supreme court* were first called upon, to put a

construction upon these laws; and it was adjudged in 3 *Cranch*, 73, that the *United States* would gain no priority, in case of a partial *bona fide* transfer of his property, by the debtor, but could only obtain it, by such a general divestment of property, as would in fact be equivalent to insolvency, in its technical sense.    In 1810, the same court decided, that the term 'insolvency,' as used in the first acts, and 'bankruptcy,' as used in the latter acts, are synonymous terms.    That priority must be confined to the cases of insolvency specified in the act, and that insolvency must be understood to mean a legal, and known insolvency, manifested by some notorious act of the debtor pursuant to law; not in a vague allegation, which in adjusting conflicting claims of the United States, and individuals, against debtors, it would be difficult to ascertain.    8 *Cranch.* 431.

The same construction has been maintained in 2 *Wheat.* 396, and 1 *Peters*, 386.    And in a very recent case, Mr. *Justice Thompson* says, the act looks to a legal insolvency, where the property is taken up by the law for distribution among the creditors of the debtor.    There is no difficulty in the construction of the statute, until we arrive at the last phrase, 'legal bankruptcy.'    What is legal bankruptcy?

In 1797, when the act of Congress was passed, *the United States* had no bankrupt law.    The words in this connexion seem to have reference to the previous cases put in the section, and to point out some legal insolvency, or some mode of proceeding, by which the property of the debtor is taken out of his hands, and to be distributed by others, 1 *Paine's C. C. Rep.* 629.    Such being the construction of the acts of Congress, giving the Government a preference, we proceed to inquire whether the *Elkton Bank*, was in such a situation as to impart to *the United States* this preference.

The above decisions demonstrate, that the inability of the *Elkton Bank* to pay her debts, as admitted in the statement, could not *per se*, give to *the United States* the preference contended for.    It must in the language of the authorities be, a known, and legal insolvency, the former of which is

not admitted, and the latter could not be predicated of such a condition.

Does the act of 1829, ch. 170, with the proceedings consequent thereon, give rise to the priority contended for? This act provides for the election *at the next* annual meeting of the stockholders, held in pursuance of their charter, of two trustees, to settle all the outstanding debts, and credits of the bank; and further provided, that they should be elected in the same manner as the president and directors have been theretofore elected.

By referring to the charter of the bank it will be found, that one of the fundamental laws required the president and directors to give one months' notice in the most public places in the county, and in some public print in the *City of Baltimore*, of the time and place of holding the election of directors annually; and it was furthermore by a supplement to the said charter required, that the election for directors should take place on the fourth Monday of *May*.

If it were conceded to the Legislature that they possessed power, to wind up the concerns of this particular institution by such an act, it must be admitted, that the legal provisions of the act, calculated to apprise all interested of the fundamental changes about to be operated in its government, that they might have an opportunity of protecting their interests by their presence, should have been complied with, in order to give legal efficacy to the acts done under it.

So far however from this, we are informed by the statement, that no notice was given, and that two persons were elected by a majority of the stockholders, on a different day from the day of the annual election of directors, as the trustees, who never accepted. So that the law was in truth, never executed; but the proceedings had under it, were undoubtedly inoperative and void, and could therefore not in any manner have operated as *a general divestment of property*, within the contemplation of the act of Congress, as upon this ground to have given *the United States* a preference. But, on the contrary, the charter still thereafter con-

tinued to exist, and its affairs were, or ought to have been rightfully managed, and controlled by its then directors, who would continue in office for its government, and the exercise of its corporate functions, until such election should take place.

Although no priority may exist on the part of *the United States*, it has been argued that the appointment of receivers, by the Circuit court of *the United States*, to take charge of the property and effects of *the Elkton Bank of Maryland*, placed the debt due from the defendant, so under the control of that court as a court of equity, that it could be reached legally by no process of execution or attachment. It is true that money, or effects in the hands of the assignee of the bankrupt, or the trustee of an insolvent debtor, cannot be attached, not only because such property stands assigned by operation of law, but because the allowance of such attachments would utterly defeat, the whole policy of the bankrupt, or insolvent laws. Nor can money taken by a sheriff in execution, or money paid into court—*Serg. on attach.* 89. But we apprehend that the appointment, and bonding of receivers, does not work such disability. The property by the order, is not taken under the protection of the court, and until taken in charge by the receivers, its summary jurisdiction could not be interposed to punish such as might cover it, or portions of it, by execution, or attachment. The period when it might, or ought legally to be considered, as under the mantle of legal protection, should be the time when a court of chancery, would interpose by attachment, for disturbing or interfering with the possession of the receiver.

Innocent third persons might be grievously affected by extending this doctrine further. It has been argued, and we think with much force, that there is, and ought to be, an analogy in this respect, between the law applicable to receivers, and sequestrators.

As regards the latter, the court of *King's Bench* have decided, that where a sequestration is awarded to collect money to pay a demand in equity, if it is not executed;

that is, if the sequestrators do not take possession, and a judgment creditor take out execution, notwithstanding the sequestration awarded, there may be a levy under the execution. 9 *Ves.* 335. So here, the receivers never obtained possession of the credits of the *Elkton Bank of Maryland*; its books, and papers, or its evidences of debt. On the contrary, so far as we are enabled to collect the fact in this respect from the record, they were held adversely; the Circuit court of *the United States* giving their aid and assistance to the receivers to enable them to obtain the possession, with what effect we know not, except that we are left to infer from the fact of the attachment subsequently issued against the defendant by *the United States,* that they never did obtain the possession. We are not informed by the record that the receivers ever took any steps whatever, to assume control over the debt which the defendant owed to the *Elkton Bank.* On the contrary, they take out an attachment in the name of *the United States,* and serve it on the defendant as garnishee, long after the attachment issued, and served by the plaintiffs in this case, and indeed, the statement admits, that they never attempted to exercise a control over this debt.

Lastly, it is urged, that the judgment of condemnation obtained against *Beaston* by *the United States,* should operate as a bar, against the recovery of the plaintiff in this case.

It is undoubtedly a hardship on the defendant to be compelled twice to pay the same debt; but it must be recollected, that the plaintiff had a prior attachment, which operated as a lien, and it would be a still greater hardship, that such plaintiff should lose his lien thus legally acquired by the judgment of a court in a cause to which he was no party, and of which, we have no evidence, he had in any manner, any notice.

If the defendant failed to take the proper steps, in the predicament in which he was placed, to defend, and protect his interests, it is but fair that he should suffer the consequences. Had notice been given of this attachment by the

*United States*, the plaintiff might have vindicated his rights, and had an opportunity of asserting his anterior lien, and of obtaining the decision of the appellate court, had it been necessary.    Nor is it perceived why it would not have been competent for the defendant in this conflict of claims against him, to have brought the conflicting parties into chancery, where the rights and priority of each might have been adjudicated without prejudice to him.

But least of all, would the defendant have been entitled to avail himself of the judgment of the *United States* recovered against him, since, from the examination of the record of that suit, it appears that his defence was taken solely upon the plea of. *nulla bona*, a defence, which could certainly have been of no avail, when it appeared by the answers filed to the interrogatories of the *United States*, that he was indebted to the *Elkton Bank of Maryland*; although in the answers he adverts to the attachment issued against him by the *Farmers' Bank of Delaware*, he has not pleaded such prior attachment as pending against him, whereby he could obtain the opinion of the court, in relation to its priority.

In every aspect, therefore, in which we can view the decision of the court below, we are brought to the conclusion, that it cannot be sustained.

JUDGMENT REVERSED, *and judgment on the case stated, for the appellant.*